Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2017 CO 82**

**No. 17SA14, <u>People v. Kendrick</u>—Disqualification—Special Circumstances.**

In this interlocutory appeal, the supreme court reviews the district court's decision to disqualify the District Attorney's Office for the Fourth Judicial District from re-prosecuting the defendant's case after a second mistrial. The court concludes that the district court misinterpreted the "special circumstances" prong of section 20-1-107(2), C.R.S (2016), in finding that the circumstances at issue satisfy the high burden required to bar an entire district attorney's office from prosecuting a defendant.

Accordingly, the court concludes that the district court abused its discretion in disqualifying the District Attorney's office, reverses the district court's order, and remands the case for further proceedings.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 82

**Supreme Court Case No. 17SA14**
*Interlocutory Appeal from the District Court*
El Paso County District Court Case No. 15CR2069
Honorable Jann P. DuBois, Judge

**Plaintiff-Appellant:**

The People of the State of Colorado,

v.

**Defendant-Appellee:**

Maurice Dee Kendrick.

**Order Reversed**
*en banc*
July 3, 2017

**Attorneys for Plaintiff-Appellant:**
Daniel H. May, District Attorney, Fourth Judicial District
Jennifer Darby, Deputy District Attorney
Stephanie Redfield, Deputy District Attorney
Doyle Baker, Senior Deputy District Attorney
  *Colorado Springs, Colorado*

**Attorneys for Defendant-Appellee:**
The Kohn Law Firm
Molly Hostetler
Shimon Kohn
  *Colorado Springs, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.

¶1 Prosecutors from the District Attorney's Office for the Fourth Judicial District (the "District Attorney") twice brought the defendant, Maurice Dee Kendrick, to trial on numerous charges related to allegations that he threatened several women with a gun and then fired the gun at two occupied houses. Each trial ended in a mistrial, and after ordering the second mistrial, the district court found, pursuant to section 20-1-107(2), C.R.S. (2016), that "special circumstances" rendered it unlikely that Kendrick would receive a fair trial if he were again tried by the District Attorney. Accordingly, the court disqualified the District Attorney from re-prosecuting the case and ordered that a special prosecutor be appointed to try Kendrick a third time. The People then filed what they deemed an interlocutory appeal pursuant to C.A.R. 4.1, requesting that we reverse the disqualification order.[1]

¶2 As a threshold matter, we note that the People erred in filing the current proceeding under C.A.R. 4.1. That rule enumerates specific grounds for interlocutory appeals in criminal cases, and district attorney disqualification is not one of those grounds. As discussed more fully below, however, section 16-12-102(2), C.R.S. (2016), specifically allows the People to file an interlocutory appeal in the circumstances presented here, and we will treat the People's appeal as having been filed under that statute. Turning then to the merits, we conclude that the district court misinterpreted the "special circumstances" prong of section 20-1-107(2) in finding that the

_____

[1] In their "Notice of Interlocutory Appeal," the People raised the following issue:

> Did the district court err in disqualifying the District Attorney for the Fourth Judicial District from prosecuting the case against defendant?

2

circumstances of this case satisfy the high burden required to bar an entire district attorney's office from prosecuting a defendant.

¶3     Accordingly, we conclude that the district court abused its discretion in disqualifying the District Attorney, and we therefore reverse the district court's order and remand this case for further proceedings consistent with this opinion.

## I.  Facts and Procedural History

¶4     Late one night, Kendrick visited the home of his friend A.B., where she and four other women were drinking and "hanging out."  According to several witnesses, Kendrick began flirting with two of the women, but they were not interested in him. This upset Kendrick, and he brandished a gun and threatened the women.  A.B. then told him to leave, and he went outside, where a car was waiting for him.

¶5     Witnesses further reported that after Kendrick got into the car, he drew his gun and fired several rounds toward A.B.'s house and a neighboring house.  Some of the women who had been visiting A.B. were in A.B.'s front yard, the rest were inside A.B.'s house, and A.B.'s neighbor and the neighbor's six-year-old son were in their house.  The police found three bullets at A.B.'s house and four bullet holes on the exterior of the neighbor's house (two bullets had ended up in the neighbor's living room, a third was found by an easy chair, and the fourth was found in a desk in the son's room).

¶6     The District Attorney subsequently charged Kendrick with numerous counts, including seven counts of attempted first-degree murder (extreme indifference), seven counts of attempted first-degree assault, five counts of felony menacing, and one count of illegal discharge of a firearm.  Kendrick pleaded not guilty to all of the charges, and

the case proceeded to trial twice.[2]  What follows relates only to the second trial, which began the day after the first trial ended in a mistrial.

¶7     At the beginning of Kendrick's second trial, his counsel gave an opening statement in which he stated, "[A.B.], we expect her to testify that when things started boiling up, she walked [Kendrick] out to the car.  We expect her to testify that she saw him shooting at the ground and saw sparks flying off the ground."  Counsel further contended that none of the prosecution's expert testimony would repudiate A.B.'s statement.

¶8     The record suggests that Kendrick's expectations regarding A.B.'s testimony arose from an interview that defense counsel and his investigator had conducted with A.B. at counsel's office about six months prior to the trial.  Counsel memorialized A.B.'s statements during that meeting in a memorandum labeled "Confidential attorney work product" on each of its five pages.

¶9     According to that memorandum, A.B. told the attorney and the investigator that "they were all pretty drunk that evening, even [Kendrick]."  She did not, however, mention any drugs.  She further said that "she would only talk about the things that she knew she could remember for sure."  She then recalled that Kendrick "was walking around and talking with everyone" but that one of the women who was there told him that she "didn't talk to black guys" and then started giving Kendrick "a hard time."

---

[2] During the first trial, the district court declared a mistrial before the jury had been sworn.  The mistrial was precipitated by the facts that (1) one prospective juror had said in open court that she had worked with Kendrick at the jail (and therefore could not be fair to him) and (2) two other prospective jurors observed that Kendrick was wearing a leg brace and therefore was in custody.

A.B. said that this woman "got in [Kendrick's] face," and so A.B. told Kendrick to "just leave." Kendrick then started walking toward the door, and A.B. retrieved a gun that she had been holding in the closet for him. As Kendrick was leaving, however, the women other than A.B. "all started talking shit to him" and "ganging up on him." Only A.B., out of the five women, defended Kendrick.

¶10 The attorney and the investigator then asked A.B. several questions regarding the gun. A.B. clarified that while Kendrick was in the house, "the gun was never pointed directly anywhere or at anyone" and that "she never saw [Kendrick's] finger on the trigger." When Kendrick stepped outside and into a waiting car, however, she saw the gun aimed at the ground. She was standing "right by" the vehicle when the gun went off, and she heard approximately four or five shots and saw "sparks" on the ground when the gun went off. She was not frightened, however, because she knew Kendrick, "and he would never mean to hurt anyone."

¶11 In contrast to the statements that A.B. had made during the interview, when the prosecutor called her to testify at Kendrick's trial, she recalled few details of the night in question, except that she was drinking and using cocaine. For example, she did not remember whether Kendrick had a gun with him when he arrived at her house, and she denied storing one for him while he was there. Nor did she remember Kendrick's flirting with several of the women or his advances being rejected by them. And she did not recall giving Kendrick a gun and did not know whether he had pointed a gun at anyone in the house. A.B. agreed with the prosecutor that Kendrick eventually went

5

outside where a car was waiting for him, but she did not remember whether he shot at the house after getting into the car.

¶12    Defense counsel began his cross-examination of A.B. by asking about her level of intoxication on the night in question, as well as her memory.  He then asked, "And it sounds like you have spoken with me and my private investigator, . . . correct?"  A.B. replied, "Yes," at which point the prosecutor requested a copy of "the Defense report," reasoning that she was "entitled to any Defense report of any witness that they intend to cross-examine."  The court asked whether the defense had provided the report to the prosecution, and defense counsel replied that it was a defense report and that he was not required to produce it until he used it to impeach a witness.  Without addressing the merits of either side's argument, the court then ordered defense counsel to give the memorandum to the prosecutor.  Counsel did so and proceeded with his cross-examination.

¶13    In the course of this cross-examination, defense counsel asked A.B. about many of the statements that the memorandum attributed to her.  A.B. remembered saying that one of the women at her house had "got[ten] into Mr. Kendrick's face as he was getting ready to leave" and that "the other girls" had "started talking shit to Mr. Kendrick." Although she did not recall saying that she had retrieved a gun for Kendrick, she acknowledged telling the investigator that the gun had never been "pointed directly at anyone while [Kendrick] was in the house" and that she "never saw a finger on the trigger."  She also remembered saying that later, when she was outside standing next to

6

the car, Kendrick had been aiming the gun at the ground when she "saw sparks on the ground" and heard several shots.

¶14    On re-direct examination, the prosecutor confronted A.B. about the inconsistent stories that she had told at trial, in her pre-trial statement to the defense, and in a notarized letter that she had sent to the judge shortly after the incident and in which she stated that she felt like she was "coerced" by the police "into making a false statement against Maurice Kendrick due to [her] being under the influence of a drug or alcohol." A.B. told the prosecutor that her memory was better at trial than it had been on the night in question because she had since talked about the events of that evening with "the girls." She now specifically denied that Kendrick had "shot up [her] house," and when the prosecutor asked whether "bullets just magically ended up in [her] sliding glass door," she demurred, reasoning that she "live[d] in the 'hood, so it [i.e., a shooting] could happen any time." The prosecutor then proceeded to suggest that A.B. had made up the fact that Kendrick was pointing the gun at the ground, a fact that she had revealed for the first time in her interview with the defense team, after learning of the "severity" of the "extreme indifference" charges.

¶15    After A.B.'s testimony was complete, the court took a recess. When the proceedings resumed, the court stated, outside the jury's presence, that it felt it needed to make a record regarding "two possible concerns."

¶16    First, the court reported that during the recess, a juror had seen Kendrick in handcuffs being escorted across the hallway by two sheriff's deputies. The court asked both sides for comment. Defense counsel responded that the incident had so prejudiced

7

Kendrick that it required a mistrial. The prosecutor, in contrast, argued that under applicable case law, a mistrial was not required in these circumstances.

¶17 Second, the court returned to the issue of the defense memorandum that the court had required Kendrick to provide to the prosecutor. Defense counsel again argued that he should not have had to give that memorandum to the prosecution. He further stated, in response to the court's question as to whether A.B.'s testimony would be admissible in a re-trial, that he "would be arguing against that, because [he] would never have gone through [his] investigator's report point by point if [he] hadn't had to turn it over."

¶18 Ultimately, the court noted that people's fear of Kendrick had "come up" at trial and "the obvious custody of the sheriff with his hands cuffed behind his back . . . can only mean that the sheriff felt he needed that." The court thus expressed concern about the likelihood that jurors might "assume that [Kendrick] would do the sort of thing it's claimed he's done, get mad at people and wave a gun around, shoot at them."

¶19 The court also acknowledged that it "may have made an error" in ordering the defense to turn over the memorandum of its interview with A.B. Even accepting the prosecutor's assertion that she was entitled to any interview used to impeach a witness at trial, the court did not think that "it would have been necessary for Defense Counsel in this case to impeach [A.B.] very much, because she didn't say very much during her direct examination that needed impeachment."

¶20 For both of these reasons, the court declared a second mistrial.

8

¶21    About a month and a half later—and three days before his third trial was scheduled to begin—Kendrick filed a motion asking the district court to disqualify the District Attorney and appoint a special prosecutor. Pursuant to section 20-1-107(2), Kendrick argued that "special circumstances" existed rendering it unlikely that he would receive a fair trial. Specifically, Kendrick asserted that "[A.B.'s] testimony was as helpful to the defense as the defense could have hoped for under the circumstances," and therefore, "[i]t was obvious that there was no need for defense counsel to impeach [A.B.]." Defense counsel further contended that once he was ordered to turn over the memorandum, he "had no choice but to go through his defense report point by point with [A.B.]." He reasoned that had he left anything out, the prosecutor would have used the omission "to continue her tactic of implying that [A.B.] was colluding with the defense and that the defense was untrustworthy." Accordingly, counsel stated that he "had to completely alter how he had originally intended to handle the witness."

¶22    The result of the foregoing sequence of events, Kendrick averred, "was the complete destruction of any credibility that [A.B.] may have had." He claimed that the prosecutor had used "the dates, times, and locations" of A.B.'s meetings with the defense, which were contained in the memorandum, to "paint a picture of collusion and impropriety." Therefore, in his view, nothing short of disqualification and the appointment of a special prosecutor could remedy the fact that the District Attorney possessed "defense work product and knowledge from that defense work product" that "they never had a right to possess in the first place."

9

¶23 Because a new judge had taken over the case, and given the significance of Kendrick's motion, the court vacated the upcoming trial, gave the People thirty-one days to respond to Kendrick's motion to disqualify the District Attorney, and set a hearing to consider the parties' arguments.

¶24 The People subsequently filed a response, arguing that the disclosure of the defense memorandum did not warrant disqualification and the appointment of a special prosecutor because, among other things, "[t]he People were already apprised of the majority of the information in the [memorandum] via [a statement in Kendrick's expert's report] and statements made by the Defense in opening."

¶25 The court then conducted the scheduled motions hearing, and the parties reiterated their previous positions. Specifically, Kendrick argued that "the only way to level the playing field in this issue is to appoint a special prosecutor." The People countered that the district court had not erred in requiring Kendrick to produce the memorandum and even if it had erred, the error was harmless because "[t]here[] [was] nothing in that report that the People didn't know from other resources."

¶26 Taking into account the parties' arguments and written pleadings, which included a transcript of the proceedings before the prior judge, the court found that the memorandum was work product and that the defense was obligated to provide it to the prosecution only if the defense was "in an impeachment posture." Kendrick, however, had not used the memorandum to impeach A.B. Thus, the court found that the prior judge had erred in ordering Kendrick to turn over the memorandum to the prosecution.

10

¶27    The court then turned to the question of prejudice and found that this disclosure "impacted how Defense was approaching questioning of that witness. It may have impacted other witnesses that were called by either side, by either Prosecution or Defense." Consequently, the court expressed a "lingering concern that because the People ha[d] this information in hand, that there clearly [was] at least an appearance that [Kendrick] would not receive a fair trial, if not an actual problem of him not receiving a fair trial."

¶28    Based on these findings, the court (1) granted the motion for appointment of a special prosecutor, (2) ordered that the District Attorney tender the memorandum back to the court and stated that the court would "maintain it under seal for appellate purposes," (3) prohibited the District Attorney (including all of its "investigators, et cetera") from disclosing the contents of the memorandum to the new special prosecutor, and (4) granted Kendrick's request to seal the transcript of A.B.'s cross- and re-direct examinations.

¶29    Less than one month later, the People filed what they deemed a "Notice of Interlocutory Appeal" pursuant to C.A.R. 4.1, requesting this court's review of the district court's order.

## II. Jurisdiction

¶30    As an initial matter, we must address our jurisdiction to resolve the issue presented.

¶31    The People filed this appeal pursuant to C.A.R. 4.1, a rule that vests this court with jurisdiction to hear interlocutory appeals in criminal cases under "'extremely

11

narrow' circumstances." See People v. Smith, 254 P.3d 1158, 1160 (Colo. 2011) (quoting People v. Null, 233 P.3d 670, 674 (Colo. 2010)). C.A.R. 4.1(a) thus states, in pertinent part:

> The state may file an interlocutory appeal in the Supreme Court from a ruling of a district court granting a motion under Crim. P. 41(e) and (g) and Crim. P. 41.1(i) made in advance of trial by the defendant for return of property and to suppress evidence or granting a motion to suppress an extra-judicial confession or admission[.]

¶32 The basis for this appeal—the disqualification of the District Attorney—does not arise from an adverse ruling on a Crim. P. 41 or 41.1 motion, and therefore, the issues presented here do not fall within those rules. Cf. Smith, 254 P.3d at 1160 ("Because the suppression order had no basis in Crim. P. 41(e) and did not conceivably implicate Crim. P. 41(g) or 41.1(i), this Court lacks any proper grounds to review the order under C.A.R. 4.1(a)."). As a result, C.A.R. 4.1 does not afford this court a proper basis on which to review the order at issue, and the question becomes whether we nonetheless may do so.

¶33 Section 16-12-102(2) provides, in pertinent part, that the prosecution may file an interlocutory appeal from a ruling on a motion to disqualify a district attorney pursuant to section 20-1-107. That statute is directly pertinent here and authorizes the appeal now before us. Accordingly, we will treat the People's appeal as having been filed pursuant to that statute.

¶34 Having thus clarified our jurisdiction over this appeal, we proceed to the merits of the matter now before us.

## III. Analysis

After describing the standard of review applicable to district courts' disqualification orders, we turn to the rules that govern such disqualifications. We then apply these principles to the facts of the present case to determine whether the district court erred in disqualifying the District Attorney and ordering the appointment of a special prosecutor.

### A. Standard of Review

District courts have broad discretion in determining whether to disqualify a district attorney's office from prosecuting a particular case. People v. Palomo, 31 P.3d 879, 882 (Colo. 2001); accord Dunlap v. People, 173 P.3d 1054, 1094 (Colo. 2007). Accordingly, we will not disturb the court's decision to disqualify a district attorney's office unless the court's decision was manifestly arbitrary, unreasonable, or unfair. See People v. Jefferson, 2017 CO 35, ¶ 25, 393 P.3d 493, 498–99. In affording the district court discretion, however, we may not abdicate our responsibility to review that court's determinations. Id. at ¶ 25, 393 P.3d at 499. And as we have previously observed, a misapplication of the law necessarily constitutes an abuse of discretion. Id.; Wal-Mart Stores, Inc. v. Crossgrove, 2012 CO 31, ¶ 7, 276 P.3d 562, 564.

### B. Disqualification of the District Attorney and Appointment of a Special Prosecutor

The General Assembly enacted section 20-1-107 "to protect the independence of persons duly elected to the office of district attorney." § 20-1-107(1). Section 20-1-107(2) thus authorizes the disqualification of a district attorney (or a district attorney's office)

in a particular case "only" under three circumstances: (1) "at the request of the district attorney," (2) "upon a showing that the district attorney has a personal or financial interest" in the prosecution, or (3) if the court "finds special circumstances that would render it unlikely that the defendant would receive a fair trial." People in Interest of N.R., 139 P.3d 671, 676 (Colo. 2006); see also People v. Perez, 201 P.3d 1220, 1228 (Colo. 2009) (noting that section 20-1-107(2) covers both district attorneys and district attorneys' offices).

¶38    In turn, section 20-1-107(4) states, in pertinent part, "If the district attorney is disqualified in any case which it is his or her duty to prosecute or defend, the court having criminal jurisdiction may appoint a special prosecutor to prosecute or defend the cause."

¶39    Until 2002, an earlier version of section 20-1-107(4) had stated, "If the district attorney is interested or has been employed as counsel in any case which it is his duty to prosecute or defend, the court having criminal jurisdiction may appoint a special prosecutor to prosecute or defend the cause." Ch. 210, sec. 4, § 20-1-107(4), 2002 Colo. Sess. Laws 757, 759.

¶40    Relying on the word "interested," this court interpreted the pre-2002 version of section 20-1-107(4) to include, as a basis for the disqualification of district attorneys, the "appearance of impropriety." Palomo, 31 P.3d at 882; see also People v. C.V., 64 P.3d 272, 275 (Colo. 2003) (defining "appearance of impropriety" as a circumstance in which, although the district attorney has no "direct interest" in the case, he or she nevertheless "has 'an interest' in the matter aside from his or her 'professional responsibility of

14

upholding the law'") (quoting People ex rel. Sandstrom v. Dist. Court, 884 P.2d 707, 711 (Colo. 1994)).

¶41 As pertinent here, however, the 2002 amendments (1) added section 20-1-107(2), which enumerated specific grounds for disqualification, and (2) replaced the phrase "interested or has been employed as counsel" with the word "disqualified." See ch. 210, sec. 4, § 20-1-107, 2002 Colo. Sess. Laws 757, 758–59. Construing the foregoing statutory changes in N.R., 139 P.3d at 675, we concluded that the 2002 amendments had eliminated "appearance of impropriety" as a basis for the disqualification of district attorneys. We thus clarified that disqualification pursuant to section 20-1-107 is proper only when (1) the district attorney requests his or her own disqualification, (2) the district attorney has a personal or financial interest in the prosecution, or (3) special circumstances exist that would render it unlikely that the defendant would receive a fair trial if prosecuted by the district attorney. Id. at 676; accord § 20-1-107(2).

¶42 Nothing in the record before us indicates that the District Attorney either (1) requested that the court disqualify his office from prosecuting Kendrick or (2) had a personal or financial interest in this prosecution. Moreover, throughout these proceedings, Kendrick has based his arguments for the District Attorney's disqualification and the appointment of a special prosecutor on section 20-1-107(2)'s third prong—the existence of "special circumstances." Consequently, we will limit our analysis to whether, pursuant to section 20-1-107(2), special circumstances existed rendering it unlikely that Kendrick would receive a fair trial if he were prosecuted by the District Attorney.

15

¶43 We have never specifically defined what circumstances qualify as "special circumstances" that would render a fair trial so unlikely that they warrant disqualification of the district attorney. People v. Loper, 241 P.3d 543, 546 (Colo. 2010). We have, however, noted that the "special circumstances" must be "extreme." Id. And in practice, we have identified only one scenario in which the circumstances were sufficiently extreme so as to justify disqualifying a district attorney under section 20-1-107(2). Id.

¶44 Specifically, in People v. Chavez, 139 P.3d 649, 654 (Colo. 2006), we upheld an order disqualifying an assistant district attorney in a case in which (1) the assistant had an attorney–client relationship with the defendant and (2) this relationship was "substantially related" to the prosecution then before the court. Under those circumstances, we concluded that the defendant could not likely receive a fair trial were he to be prosecuted by the assistant district attorney at issue. Id. at 653; cf. Osborn v. Dist. Court, 619 P.2d 41, 44–45 (Colo. 1980) (affirming the disqualification of an attorney and her law firm when the attorney had participated in the defendant's prosecution before joining the law firm, reasoning, in part, that as a prosecutor, the attorney had formed an ongoing relationship with the juvenile victim and "[t]he advantage that such a relationship could give a defense lawyer on cross-examination of the victim is obvious").

¶45 In contrast, we have declined to find such "special circumstances" when the circumstances of a case had no bearing on whether the defendant would be likely to receive a fair trial, even if those circumstances may have raised concerns of impropriety.

16

Loper, 241 P.3d at 547. In Loper, for example, we disagreed with the district court's determination that involvement in the prosecution by the victim's mother—a probation officer who worked for the judicial district—amounted to "special circumstances" justifying disqualification of the district attorney's office. Id. at 544, 548. Although, in the district court's view, this fact "[left] a bad smell," that smell "concern[ed] the potential impropriety of the district attorney, which [was] no longer relevant under section 20-1-107, rather than whether [the defendant] would be unlikely to receive a fair trial." Id. at 547. Thus, even if the victim's mother had influenced the district attorney's decision to charge the defendant, "this influence [did] not jeopardize the likelihood that [he would] receive a fair trial." Id.; see also Perez, 201 P.3d at 1230–32 (concluding that the district court had erred in disqualifying the entire district attorney's office based on an assistant district attorney's prior representation of the defendant and the consequent appearance of impropriety because the appearance of impropriety was not a proper ground for disqualification and the record showed that the assistant had no confidential information to pass on to other prosecutors working on the case).

¶46     Here, the district court ordered the disqualification of the District Attorney based on the court's "lingering concern that because the People have [the defense memorandum] in hand, . . . there clearly is <u>at least an appearance</u> that the defendant would not receive a fair trial, if not an actual problem of him not receiving a fair trial." (Emphasis added.) The court also agreed with Kendrick's argument that ordering the disclosure of the memorandum forced defense counsel to change the way he

17

cross-examined A.B. and "may have impacted other witnesses that were called by either side."

¶47 Insofar as the district court based its ruling on a perceived "appearance" of impropriety, we conclude that the court applied an incorrect legal standard because, as noted above, the appearance of impropriety is no longer a valid basis for disqualifying a district attorney. See Perez, 201 P.3d at 1232.

¶48 Moreover, applying the proper "special circumstances" standard, which requires the circumstances at issue to be "extreme," Loper, 241 P.3d at 546, we conclude that the memorandum's disclosure (and the proceedings that followed) did not warrant the District Attorney's disqualification. As the People contend, they were privy to most, if not all, of the information contained in the memorandum long before the district court ordered Kendrick to produce it. For example, on the evening of the incident in question, A.B. gave a statement to a responding police officer that substantially tracked what she would later tell defense counsel and his investigator. In addition, defense counsel revealed the essential portions of the memorandum in his opening statement, when he told the jury what he expected A.B. would say at trial. And certain of the information at issue was set forth in Kendrick's expert's report.

¶49 For all of these reasons, as in Perez, 201 P.3d at 1230, we are not convinced that any confidential information was, or could have been, passed to other members of the prosecutor's office.

¶50 We are not persuaded otherwise by Kendrick's broad assertions of prejudice. According to Kendrick, the District Attorney's "knowledge of the report may influence

18

their strategy in the presentation of witnesses, in the questions they ask of witnesses, and in how they anticipate defense questions" in a future, third trial. Kendrick provides no specifics, however, instead claiming that, like the prosecutor in Chavez, "[t]he District Attorney's office actually has in their [sic] possession improperly obtained confidential work-product." But as discussed above, the factual scenario in Chavez is quite different from that at issue here. In Chavez, 139 P.3d at 654, the assistant district attorney had an attorney–client relationship with the defendant, and this relationship was substantially related to the prosecution there at issue. In this case, in contrast, the District Attorney had no prior relationship with Kendrick, and the pertinent information that the District Attorney learned from the memorandum was available elsewhere, most notably from the statement that A.B. gave to a responding police officer on the night of the incident in question, from defense counsel himself, and from Kendrick's expert's report.

¶51 Nor are we persuaded that disclosure of the memorandum gave the prosecutor an ability to attack A.B.'s credibility that she did not have before. As noted above, A.B.'s statement to the responding police officer, her notarized letter to the district court, and her trial testimony all contained a number of inconsistent statements. Accordingly, even without the memorandum, the prosecutor had substantial information on which she could have relied to challenge A.B.'s credibility.

¶52 And we are unconvinced by Kendrick's reliance on United States v. (Under Seal), 757 F.2d 600 (4th Cir. 1985). In that case, which involved a grand jury investigation, an assistant United States attorney and, it appears, two investigative agents had reviewed

19

a number of documents subject to the attorney–client privilege.  Id. at 601.  The attorney informed the court that privileged documents had been reviewed and apparently agreed that she would return those documents to the appellees' counsel and not make further use of them.  Id. at 602.

¶53    The district court, however, did not find the government's proposed remedy to be sufficient:

> [T]he remedy suggested by the United States, namely, no further use by the government of the privileged documents and their return to counsel for the [appellees], will not adequately maintain the integrity of the confidential attorney-client privilege, and cannot insure that those who have viewed the documents will not, even subconsciously, be affected by knowledge gained thereby in pursuing the investigation of the [appellees]. The court further concludes that the only adequate appropriate remedy is disqualification of the Assistant United States Attorney and two agents from further participation in the investigation.

Id.

¶54    The district court therefore ordered, among other things, that the assistant United States attorney and the two investigators involved be "disqualified and prohibited from directly or indirectly participating in the [grand jury] investigation"— an order that, it appears, the attorney ignored when she participated fully in the grand jury proceedings that subsequently resulted in the appellees' indictment.  Id.

¶55    The government appealed, but the Fourth Circuit did not reach the disqualification issue, ruling instead on mootness grounds.  Id. at 602–03.  Specifically, although noting its "discomfort" with a ruling that allowed the government to escape accountability for its disobedience of the district court's orders, the appellate court agreed with the government that the grand jury proceedings had terminated with the

20

return of indictments, thereby making it impossible for the court to provide effective relief. Id.

¶56 Because the Fourth Circuit did not address the disqualification issue, we do not perceive (Under Seal) as particularly helpful here. Even had the court addressed the issue, however, we see nothing in that case that undermines our conclusion that pursuant to section 20-1-107 and pertinent Colorado case law, no "special circumstances" existed in this case that would render it unlikely for Kendrick to receive a fair trial if prosecuted by the District Attorney.

## IV. Conclusion

¶57 For these reasons, we reverse the district court's order disqualifying the District Attorney and ordering the appointment of a special prosecutor, and we remand this case for further proceedings consistent with this opinion.