22CA0368 Peo v Germanson 05-01-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0368
City and County of Denver District Court No. 19CR8178
Honorable David H. Goldberg, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jacob L. Germanson,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE HAWTHORNE*
Lipinsky and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 1, 2025

---

Philip J. Weiser, Attorney General, Claire V. Collins, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meghan M. Morris, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Jacob L. Germanson, appeals the judgment of conviction entered on jury verdicts finding him guilty of two counts of sexual assault, one count of second degree assault (strangulation), and one count of third degree assault.  We affirm.

## I.     Background

¶ 2     In late October 2019, the victim, R.T., called the police to report that her boyfriend — Germanson — had sexually assaulted her.  Less than thirty minutes later, Germanson called the police to report that his girlfriend — R.T. — would call them to falsely report he had sexually assaulted her.  The police arrested Germanson, and the prosecution filed a complaint and information charging[1] him with two counts of sexual assault with force under section 18-3-402(1)(a), (4), C.R.S. 2019; one count of second degree assault for strangulation under section 18-3-203(1)(i), C.R.S. 2024; and one count of third degree assault under section 18-3-204(1)(a), C.R.S. 2019.

¶ 3     Germanson asserted that R.T. consented to engage in sexual intercourse with him, but that she later filed a false police report

---

[1] For statutes that have since changed, we apply the versions in effect at the time of the underlying incident.

1

against him because she became angry upon learning that he was not divorced from his wife.

¶ 4     The case proceeded to a jury trial.  As noted above, the jury found Germanson guilty of two counts of sexual assault, one count of second degree assault (strangulation), and one count of third degree assault.  On one of the sexual assault counts, the jury found that Germanson caused R.T.'s submission through force or violence, which enhanced that count from a class 4 felony to a class 3 felony under section 18-3-402(4)(a), C.R.S. 2019.

¶ 5     On appeal, Germanson contends that the district court abused its discretion by (1) improperly admitting as res gestae evidence his communications with R.T. in the days leading up to the sexual encounter; (2) allowing a domestic violence expert (the DV expert) to testify beyond the scope of the prosecution's disclosure of her anticipated testimony; and (3) permitting a sexual assault nurse examiner (SANE) to testify beyond her expertise and allowing her to comment on R.T.'s credibility.  Germanson also contends that we should reverse his judgment of conviction under the cumulative error doctrine.

## II.     Standard of Review

¶ 6     We review a trial court's evidentiary rulings — such as rulings on admission of exhibits and expert testimony — for an abuse of discretion.  *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011).  A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or is based on misapprehending or misapplying the law.  *People v. Kendrick*, 2017 CO 82, ¶ 36.  Determining whether a court misapprehended or misapplied the law "does not require deference to the trial court.  Instead, the trial court's application or interpretation of the law when making an evidentiary ruling is a question of law we review de novo."  *People v. Dominguez*, 2019 COA 78, ¶ 13.

¶ 7     "[W]e review nonconstitutional trial errors that were preserved by objection for harmless error," meaning "we reverse if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'"  *Hagos v. People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 8     We review unpreserved errors for plain error and reverse such errors only if they "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the

3

judgment of conviction." *Hagos*, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

### III.    Admitting Evidence under the Res Gestae Doctrine

#### A.    Additional Background

¶ 9      The district court held a pretrial hearing on the prosecution's "Notice of Intent to Introduce Res Gestae and 404(B) Evidence" and Germanson's response to the notice.  The prosecution sought to introduce text messages and telephone calls between R.T. and Germanson in the two days leading up to the assault as res gestae and CRE 404(b) evidence.

¶ 10     The court found that the communications evinced Germanson's "motive, opportunity, intent, and preparation" for the charged assaults and that the communications were "res gestae of the events and the incidents in this case as alleged in the information and complaint."  It also found that, under *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990), the communications related to a material fact, were logically relevant and had a tendency to make the material fact's existence more or less probable than without the communications, and were not being submitted to establish Germanson's bad character.  Considering all the evidence,

the court found that the communications' probative value outweighed the danger of unfair prejudice and concluded they were also admissible under CRE 404(b).

¶ 11     Later, Germanson filed a motion in limine in which he asked the court to provide a contemporaneous limiting instruction before receiving any evidence under CRE 404(b).  The court denied Germanson's request without prejudice, reasoning that the request was premature, and said it would "consider a limiting instruction if and when testimony [was] introduced and if and when [it] determine[d] that an . . . instruction [was] appropriate."  During the jury instruction conference, after the court admitted the communications into evidence, Germanson proposed an instruction to limit the communications' purpose under CRE 404(b).  The court rejected the proposed limiting jury instruction and found that the communications were "res gestae and not [CRE] 404(b)" evidence.

## B.    Applicable Legal Principles

¶ 12     "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."  CRE 404(b)(1).  However, under CRE 404(b)(2), "[t]his evidence may be

admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

¶ 13     "Res gestae evidence includes the circumstances, facts and declarations which arise from the main event and serve to illustrate its character." *People v. Quintana*, 882 P.2d 1366, 1373 (Colo. 1994), *abrogated by Rojas v. People*, 2022 CO 8.  Res gestae evidence "also includes evidence that is closely related in both time and nature to the charged offense." *Id.*

¶ 14     After the court entered Germanson's judgment of conviction, the supreme court abolished the res gestae doctrine in criminal cases, recognizing "an intrinsic-extrinsic distinction, with extrinsic acts falling under Rule 404(b) and intrinsic acts falling outside the Rule's scope." *Rojas*, ¶¶ 41, 44.

## C.     Preservation

¶ 15     Germanson contends that he preserved his objections to the court's admitting the evidence of the text messages and calls under the res gestae doctrine with his motion in limine, the court's ruling, and the proposed limiting instruction he tendered during the jury instruction conference.  The People agree that Germanson

6

preserved his argument regarding the text messages but disagree that he preserved his arguments challenging the admission of evidence regarding the number of text messages and phone calls leading up to the assault and testimony concerning certain of the text messages. The People also assert that Germanson did not request a contemporaneous limiting instruction at the time the court admitted the text messages and phone calls into evidence.

## D. Analysis

¶ 16 The record shows that Germanson did not object to the prosecution's line of questioning about the number of text messages or phone calls, nor did he request a contemporaneous limiting instruction when the prosecution introduced evidence regarding such communications. Also, when Germanson requested at a pretrial hearing a limiting instruction regarding CRE 404(b) evidence, the court denied the request without prejudice, stating that it would "consider a limiting instruction if and when testimony [was] introduced." But Germanson never requested such a limiting instruction when the prosecution introduced testimony and exhibits regarding the text messages and phone calls, and he did not restate his request until the evidence had closed.

7

¶ 17     So we conclude that Germanson did not preserve his contentions about the number of text messages and phone calls leading up to the assault and the lack of a limiting instruction.  We therefore apply the plain error standard in reviewing Germanson's contentions regarding those communications.  But because Germanson preserved his argument that the court erred by admitting the text messages, such argument is subject to a harmless error standard of review.

¶ 18     Germanson contends that, after *Rojas*, courts must determine whether evidence previously deemed res gestae is intrinsic or extrinsic to the charged offense.  He argues that, because the communications leading up to the assault were extrinsic to the charges he faced and implied bad character, the court erred by admitting the evidence as res gestae.  And he argues that the court infringed on his rights to due process and a fair trial by admitting evidence of prior bad acts without a limiting instruction because such evidence allowed the jury to infer guilt based on his purported character.  The People assert that the communications are intrinsic evidence or otherwise admissible under CRE 404(b).

¶ 19 Because the district court conducted a sufficient analysis under *Spoto* during the pretrial hearing to permit admitting the communications as CRE 404(b) evidence, *supra* Part III.A, we need not address the evidence's admissibility under *Rojas*. So we discern no error in the court's admitting the communications under CRE 404(b) despite its ruling that it admitted them as res gestae. *See People v. Dyer*, 2019 COA 161, ¶ 39 ("[A]n appellate court may affirm a lower court's decision on any ground supported by the record, whether relied upon or even considered by the trial court.").

¶ 20 We also reject Germanson's contention that the court infringed on his right to due process and a fair trial by declining to provide the jury with a limiting instruction. Germanson failed to request a limiting instruction contemporaneously when the court admitted the text messages and phone calls. And the court must do so only when a defendant requests such an instruction. *Rojas*, ¶ 27 ("If a court determines the evidence is admissible, the court must also, *upon request*, contemporaneously instruct the jurors of the limited purpose for which the evidence may be considered.") (emphasis added). Accordingly, we discern no error, let alone plain error, in

the court's declining to give the jury a limiting instruction after the close of evidence.

## IV. Expert Testimony

### A. Applicable Legal Principles

#### 1. Crim. P. 16 Disclosure

¶ 21    Crim. P. 16(I)(d)(3) addresses discretionary disclosures in criminal cases and states that

> [w]here the interests of justice would be served, the court may order the prosecution to disclose the underlying facts or data supporting the opinion in that particular case of an expert endorsed as a witness. If a report has not been prepared by that expert to aid in compliance with other discovery obligations of this rule, the court may order the party calling that expert to provide a written summary of the testimony describing the witness's opinions and the bases and reasons therefor, including results of physical or mental examination and of scientific tests, experiments, or comparisons. The intent of this section is to allow the defense sufficient meaningful information to conduct effective cross-examination under CRE 705.

¶ 22    While disclosures under Crim. P. 16(I)(d)(3) are discretionary, it is "better practice for the prosecution to specifically identify . . . an expert witness." *People v. Greer*, 262 P.3d 920, 930 (Colo. App. 2011).

10

## 2. CRE 702

¶ 23 Expert testimony is admissible under CRE 702 if the proffered testimony is reliable, the expert is qualified to opine on such matters, and the expert testimony is relevant. *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001). A trial court's reliability inquiry "should be broad in nature and consider the totality of the circumstances of each specific case." *Id.* at 78; *see Brooks v. People*, 975 P.2d 1105, 1114 (Colo. 1999) (experience-based expertise is subject to the standards of CRE 702). And expert testimony is relevant — meaning it is useful to the jury — when it assists the jury "to either understand other evidence or to determine a fact in issue." *People v. Ramirez*, 155 P.3d 371, 379 (Colo. 2007). A court must balance its discretion to allow expert witness testimony with its obligation to ensure that the probative value of the expert's testimony is not substantially outweighed by unfair prejudice. *See id.*

### B. Scope of the DV Expert's Testimony

#### 1. Additional Background

¶ 24 Before trial, Germanson requested an order requiring the prosecution to disclose certain materials and information related to any expert witness the prosecution may endorse. And before trial,

the prosecution filed an "Endorsed List of Witnesses" (the witness list) that included the DV expert, the DV expert's curriculum vitae, and a statement of her opinions. In the statement, the DV expert said that she usually testified regarding "general information about domestic violence" and identified eight specific issues regarding domestic violence, including "pattern of abuse" and "domestic violence dynamics."

¶ 25    Germanson objected to the DV expert's endorsement as an expert witness in the field of domestic violence under CRE 702 and requested a pretrial hearing on the proper scope of the DV expert's testimony. Among other points, he argued that, because R.T. had "specifically reported that there were not prior acts of domestic violence" in her relationship with Germanson, the DV expert's proposed testimony regarding the pattern of abuse and domestic violence dynamics would unduly prejudice Germanson by allowing the jury to infer past acts of domestic violence.

¶ 26    As relevant here, in its response to Germanson's objection, the prosecution argued that "[t]he defendant's power and control over the victim helps to explain behaviors that, when viewed in isolation, might conflict with what an ordinary juror might intuitively expect."

The prosecution provided examples of such behaviors, such as Germanson (1) ordering R.T. to make him food; (2) isolating R.T. from her family; (3) prohibiting R.T. from going to work; (4) calling R.T. repeatedly on the phone; (5) making demands of R.T. regarding her behavior and her role as his girlfriend; and (6) threatening to harm himself with his gun. The prosecution argued that "[a]ll of these behaviors [were] part of a power and control dynamic and help to explain certain counter-intuitive dynamics and behaviors exhibited by the victim, which could not be explained without explicit reference to the power and control dynamic and cycle of violence."

¶ 27    At the hearing on Germanson's objection to the DV expert's testimony, the court ruled as follows:

> [T]he pattern of abuse and dynamics and the cycle of violence and pattern of abuse, even if this is the first act, doesn't preclude the testimony. Rather, as I understand it from the disclosures, the facts in this case, and my understanding of [this] witness[] in relation to the *Cooper*[2] case, the dynamics of power and control and mechanism of power doesn't necessarily need to be predicated upon a prior act of domestic violence but can be explained

---

[2] The court was referencing *People v. Cooper*, 2021 CO 69.

13

> as part of a continuum which culminates in an act of domestic violence.
>
> Based on my understanding of [the DV expert's] background and training, education, and experience, she will be admitted — or will be allowed, so long as appropriate foundation is laid, because I do believe it fits this case based on my understanding of the facts as well as applying the *Shreck* analysis. I do believe that it is permissible under [CRE] 702 as well as 401 and 402.

¶ 28    At trial, the prosecutor asked the DV expert on direct examination, "how do things like male privilege or gender roles fall under the dynamic of power and control?" Defense counsel objected and argued that the topic exceeded the scope of the prosecution's disclosure for the DV expert. The court overruled the objection and permitted the DV expert to testify about gender roles and power dynamics.

### 2.    Analysis

¶ 29    Germanson contends that the court erred by allowing the DV expert to testify about male privilege and gender roles because the prosecution did not disclose those topics before trial. He contends that the DV expert's testimony on those topics surprised defense counsel and impaired counsel's ability to vigorously cross-examine

the DV expert and present contrary evidence. And he asserts that the court deprived him of a fair trial by allowing the DV expert to provide the undisclosed opinions. We are unpersuaded.

¶ 30 The People argue that, in her pretrial statement, the DV expert disclosed that she would testify regarding power and control dynamics in domestic violence relationships, including tactics offenders may use to maintain power and control. They also argue that the DV expert did not claim that her statement contained an exhaustive list of the domestic violence topics on which she might testify. And the prosecution provided specific examples of Germanson's behavior, including ordering R.T. to make him food and commenting about R.T.'s role as his girlfriend. The People also argue that in his previous objection to a different domestic violence expert, Germanson had cited *People v. Cooper*, 2019 COA 21 (*Cooper I*), which was later reversed by *People v. Cooper*, 2021 CO 69 (*Cooper II*), and had acknowledged the "Power and Control Wheel" and the use of male privilege dynamics.

¶ 31 Notably, at the pretrial hearing at which the court decided that the DV expert could provide opinion testimony on domestic violence so long as the prosecutor laid a proper foundation, the court cited

15

and relied on *Cooper II* and *Shreck*. In *Cooper II*, ¶ 52, the supreme court held that "generalized expert testimony fits a case if it has a sufficient logical connection to the factual issues to be helpful to the jury while still clearing the ever-present CRE 403 admissibility bar." And the opinion in *Cooper II*, ¶¶ 22-23, reproduces the "Power and Control Wheel," a tool "developed by social scientists to explain the common dynamics of domestic violence," including male privilege. In their discussion of the court's reliance on *Cooper II* when it ruled on Germanson's pretrial motion regarding the scope of the DV expert's testimony, the People cite *Phillips v. People*, 2019 CO 72, ¶ 36, for the proposition that defense counsel is presumed to know substantive law.

¶ 32    Given the pretrial pleadings and hearing, which included the prosecution's express identification of Germanson's behavior demanding that R.T. cook for him and fulfill her role as a girlfriend, defense counsel's acknowledgment of the Power and Control Wheel tool that includes male privilege, and the court's reliance on *Cooper II*, we cannot conclude that the prosecution's questions to the DV expert about gender roles and male privilege surprised defense counsel. And if defense counsel was truly surprised by the elicited

16

testimony and believed it was prejudicial, counsel could have contemporaneously asked the court for a continuance.  *See People v. Brown*, 313 P.3d 608, 617 (Colo. App. 2011) ("Defendant's failure to request a continuance belies any claim that he was surprised or prejudiced by the detective's testimony."); *People v. Graham*, 678 P.2d 1043, 1047-48 (Colo. App. 1983); *People v. Anderson*, 837 P.2d 293, 299 (Colo. App. 1992) ("[Any] claim by the defendant at the appellate level that he was unfairly surprised and unable to prepare adequately for cross-examination is thoroughly discredited by his failure to move for a continuance at the trial level." (quoting *Graham*, 678 P.2d at 1048)); *see also United States v. McPartlin*, 595 F.2d 1321 (7th Cir. 1979) (failure of defendants to renew request for a continuance thoroughly discredits their assertion that they were prejudiced by the timing of disclosure).

¶ 33    We also reject Germanson's argument that the prosecution violated Crim. P. 16(I)(d)(3) by failing to expressly include the topics of gender roles and male privilege in the DV expert's statement, even though it referred to domestic violence dynamics. Germanson's argument construes the discretionary disclosure rule too restrictively.  Crim. P. 16(I)(d)(3) expressly provides that "[t]he

17

intent of this section is to allow the defense *sufficient* meaningful information to conduct effective cross-examination." (Emphasis added.) Sufficient meaningful information does not equate to an exhaustive list of all topics on which the expert witness may opine. Rather, the rule permits the court to order the prosecution "to provide a written *summary* of the testimony describing the witness's opinions and the bases and reasons therefor." Crim. P. 16(I)(d)(3) (emphasis added); Black's Law Dictionary 1742 (12th ed. 2024) (defining the noun "summary" as "[a]n abridgement or brief"). Because the DV expert's statement summarized her anticipated testimony and referred to domestic violence dynamics, we conclude that the prosecution complied with its obligation under Crim. P. 16(I)(d)(3) by providing Germanson with sufficient meaningful information to allow him to conduct an effective cross-examination of the DV expert.

## C. SANE's Testimony

### 1. Additional Background

¶ 34 The prosecution also endorsed a SANE as an expert witness in its witness list and specified her expertise as "Sexual Assault and Forensic Examinations to include Strangulation." A few weeks after

filing the witness list, the prosecution filed a "Notice of [the SANE's] Expert Opinion Letter Re: Strangulation." And a couple of days after that, the prosecution filed a document entitled "[SANE's] Expert Summary," which identified the SANE's experience regarding strangulation. Germanson objected to the SANE's proffered testimony, specifically regarding strangulation, and requested a hearing.

¶ 35    After holding a hearing at which the prosecution and Germanson presented arguments regarding the scope of the SANE's testimony, the court ruled as follows:

> With respect to the science of trauma, assuming [the SANE] has sufficient knowledge or experience and training, that is something that fits this case, assuming that an appropriate foundation is laid and it is relevant to material not outweighed by prejudice under [CRE] 403, and I'll require counsel to make an appropriate objection if and when the opinions are elicited. That is something that I do believe, employing a flexible approach, satisfies the *Shreck* analysis and all . . . four prongs of the analysis, including the mechanism of injury, again, assuming that it fits this case.

¶ 36    At trial, the prosecution offered the SANE as an expert in sexual assault and forensic examinations, including strangulation. Before the court accepted the SANE as an expert, defense counsel

conducted voir dire and asked the SANE whether she was "able to make a diagnosis for any issues related to strangulation[] or [was] a doctor required to do that?" The SANE responded that "[t]he doctor generally [did] that," and said that SANEs do not typically diagnose patients. Following the voir dire, defense counsel said he "ha[d] no objection to the expert being proffered in those two areas."

¶ 37    But when the SANE testified about strangulation, defense counsel objected as follows:

> [The prosecutor:]  So even if you didn't see any marks or swelling, you're relying on a patient report in that case?
>
> [SANE:]  Correct.
>
> [The prosecutor:]  Okay.  So based on the symptoms [R.T.] reported and the injuries that you observed, would you say those are consistent with strangulation?
>
> [SANE:]  Yes.
>
> [Defense counsel:]  Objection.
>
> [The Court:]  The basis?
>
> [Defense counsel:]  Improper opinion for this witness.  It also comments on the credibility [of R.T.].
>
> [The court:]  Overruled
>
> [The prosecutor:]  So that was a "yes"?

[SANE:]  Yes.

## 2.    Preservation

¶ 38    Based on defense counsel's objection noted above, Germanson contends that he preserved his argument regarding the scope of the SANE's expertise and that her testimony improperly commented on R.T.'s credibility.  The People disagree because Germanson's contentions rely on his assertion that the court erred by failing to make specific findings under *Shreck* — an issue that Germanson did not raise in his trial objection.

## 3.    Analysis

### a.    Scope of the SANE's Testimony

¶ 39    We conclude that Germanson preserved his argument that the SANE's testimony was outside the scope of her expertise.  Before trial, Germanson objected to the SANE's endorsement as an expert regarding strangulation and cited *Shreck.*  And at trial, defense counsel contemporaneously objected to the SANE's testimony regarding strangulation.  Thus, we employ a harmless error standard of review.  *Hagos,* ¶ 12.

¶ 40    Germanson contends that the court erred by not subjecting the SANE's testimony regarding strangulation to a *Shreck* analysis

when he objected to the testimony at trial. But his argument fails to acknowledge that the court conducted a *Shreck* analysis at the pretrial hearing. Also, his contention on appeal is contrary to defense counsel's concessions at the pretrial hearing. At the pretrial hearing, defense counsel said,

> I have no objection to [the SANE's] qualifications. I have no objection to her testifying as to signs and symptoms of strangulation, what was observed when she conducted a strangulation examination in this case. She also has proffered expert testimony such as that because the mechanism of strangulation is preventing blood or airflow as opposed to blunt force trauma, bruising may not occur. I have no objection to that type of testimony.

¶ 41 The record supports a finding that, as CRE 702 requires, the SANE had the necessary knowledge, experience, training, and education to form an opinion on and testify regarding strangulation. And the court conducted a *Shreck* analysis at the pretrial hearing when Germanson initially objected to the SANE's expertise regarding strangulation. The court noted that the prosecution alleged that Germanson had strangled R.T. and, assuming the SANE had sufficient knowledge or experience and training, she could testify regarding R.T.'s strangulation as long as the

22

prosecution laid an appropriate foundation and the relevance of the testimony was not outweighed by prejudice under CRE 403. Accordingly, we conclude that the court did not abuse its discretion by permitting the SANE to testify as an expert regarding strangulation.

### b. Commenting on R.T.'s Credibility

¶ 42 Defense counsel objected at trial to the SANE's testimony about strangulation because it "comment[ed] on the credibility [of R.T.]."

¶ 43 "Neither a lay witness nor an expert witness may give opinion testimony with respect to whether a witness is telling the truth on a specific occasion." *People v. Lafferty*, 9 P.3d 1132, 1135 (Colo. App. 1999). "However, under CRE 702, an expert may testify concerning whether the victim's behavior or demeanor is consistent with that of typical victims of abuse." *People v. Jenkins*, 83 P.3d 1122, 1127 (Colo. App. 2003). And "an expert witness may base an opinion on facts or data perceived by or made known to him or her at or before the hearing." *Id.* (citing CRE 703).

¶ 44 Again, Germanson's contention on appeal is contrary to defense counsel's pretrial hearing statement that "[the SANE] can

23

testify as to the injuries that were present or not present and possible reasons why those injuries were present or not present in this case."

¶ 45 The SANE testified about her examination of R.T., which included a physical exam that revealed R.T. had a bruise on the left side of her jaw and swelling of her jaw. The SANE also observed redness in the middle area of R.T.'s neck and a small bruise on R.T.'s left upper chest. In addition, she also testified about R.T.'s self-reported information regarding strangulation, such as coughing, hoarseness in her voice, and tenderness in her jaw. And the SANE testified that a patient's self-reported symptoms help guide the provider's medical treatment and exam.

¶ 46 At the conclusion of the SANE's testimony about her examination of R.T., the prosecution asked, "So based on the symptoms [R.T.] reported and the injuries that you observed, would you say those are consistent with strangulation?" Defense counsel objected that the testimony was an "[i]mproper opinion for [the SANE]. It also comments on the credibility."

¶ 47 We have concluded that the court did not err by qualifying the SANE as an expert in sexual assault forensic examinations,

24

including strangulation. Because the SANE's expertise included strangulation, she could properly opine based on the facts or data in this case that she used to guide her medical treatment and exam, including her physical examination of R.T. and R.T.'s self-reported symptoms. *See* CRE 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted."); *see also Jenkins*, 83 P.3d at 1127.

¶ 48 We conclude that the SANE did not comment on R.T.'s credibility when testifying that R.T.'s reported symptoms and the injuries that the SANE observed were consistent with strangulation. Instead, the SANE stated an opinion or inference based on the facts or data in the case that she perceived or that were made known to her at or before the trial.

## V.    Cumulative Error

¶ 49 Finally, Germanson argues that reversal is warranted under the cumulative error doctrine. To reverse based on cumulative

error, we "must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. We need not conduct a cumulative error analysis because we have concluded that the district court did not err. *See People v. Conyac*, 2014 COA 8M, ¶ 152 ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

## VI. Disposition

¶ 50 The judgment is affirmed.

JUDGE LIPINSKY and JUDGE JOHNSON concur.