Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
December 7, 2020

**2020 CO 84**

**No. 20SA206** *People v. Arellano*—**Disqualification**—**Special Circumstances.**

In this interlocutory appeal, the People contend that the district court abused its discretion in disqualifying the Fourth Judicial District Attorney's office. The district court found that under section 20-1-107(2), C.R.S. (2020), the testimony of a district attorney's office employee, who is also a victim in the case, is of sufficient consequence to establish special circumstances preventing the defendant from receiving a fair trial. The court thus granted the motion to disqualify, and the People appealed.

The supreme court now concludes that the district court did not abuse its discretion in disqualifying the district attorney's office. The district court made extensive findings of fact, all of which were supported in the record, and then properly applied the correct legal standards to the facts before it. The supreme court thus concludes that, in light of the circumstances presented here, the district court's order was not manifestly arbitrary, unreasonable, or unfair so as to

constitute an abuse of the broad discretion afforded district courts under section

20-1-107(2).

Accordingly, the supreme court affirms the order of the district court below.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2020 CO 84

### Supreme Court Case No. 20SA206
*Interlocutory Appeal from the District Court*
El Paso County District Court Case No. 20CR0619
Honorable Marcus Henson, Judge

### Plaintiff-Appellant:

The People of the State of Colorado,

v.

### Defendant-Appellee:

Erica Renee Arellano.

### Order Affirmed
*en banc*
December 7, 2020

**Attorneys for Plaintiff-Appellant:**
Daniel H. May, District Attorney, Fourth Judicial District
Kelsey Tipps, Deputy District Attorney
Robert Toole, Deputy District Attorney
Tanya A. Karimi, Deputy District Attorney
       *Colorado Springs, Colorado*

**Attorneys for Defendant-Appellee:**
Megan A. Ring, Public Defender
Austin J. Vos, Deputy Public Defender
Amanda J. Philipps, Deputy Public Defender
       *Colorado Springs, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE SAMOUR** dissents and **CHIEF JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent.

¶1　In this interlocutory appeal, the People contend that the district court abused its discretion in disqualifying the Fourth Judicial District Attorney's office.

¶2　Erica Renee Arellano is charged with second degree murder for shooting and killing her boyfriend, M.H. Arellano asserts that, during the relationship, M.H. perpetrated domestic violence on her and that self-defense may be a critical issue and the crux of Arellano's defense.

¶3　A.H. is an employee of the district attorney's office and was married to but separated from M.H. at the time of his death. A.H. is a potentially significant witness in this case because she has (and has already provided to the district attorney's office) information tending to undermine Arellano's claim of self-defense.

¶4　In light of A.H.'s relationship with the district attorney's office and the significance of her testimony to this case, Arellano filed a motion to disqualify the district attorney's office under section 20-1-107(2), C.R.S. (2020). The district court held a hearing on this motion and, in a lengthy and detailed bench ruling, found that, on the facts presented, special circumstances existed making it unlikely that Arellano could receive a fair trial. The court thus granted Arellano's motion to disqualify. The People then filed this interlocutory appeal.

¶5　We now conclude that the district court did not abuse its discretion in disqualifying the district attorney's office. The district court made extensive

2

findings of fact, all of which were amply supported by the record, correctly set forth the applicable legal standards, and then properly applied those standards to the unique facts before it. Accordingly, in the circumstances presented here, we cannot say that the district court's order was manifestly arbitrary, unreasonable, or unfair. We thus affirm that order and remand this case for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶6 Colorado Springs police officers responded to a report of a shooting at an apartment complex. Upon arrival at the scene, officers found the victim, M.H., lying on the floor, face down inside the apartment's front door. Police also found a pistol in the living room and a shell casing on the floor. First responders pronounced M.H. dead with an apparent gunshot wound to the chest.

¶7 Arellano subsequently told police that she and M.H. were arguing about their relationship when she attempted to leave the apartment, gun in hand, and M.H. physically assaulted her. Specifically, Arellano said that M.H. held the door closed, preventing her from leaving the apartment, and repeatedly hit her in the head and body with a workout bottle and with his fists. According to Arellano, the first blow, which was with the bottle to her head, caused her to fall to the ground, but she was able to crawl away from M.H. and the front door. Ultimately,

she got to the living room, stood up, and fired two shots. M.H. fell and was bleeding, and Arellano called the police.

¶8 The People subsequently filed a complaint and information charging Arellano with second degree murder. Thereafter, the People filed a "Disclosure of Information Regarding [A.H.]—Victim." This disclosure advised that A.H., who, as M.H.'s surviving spouse, was identified as a victim in the case, is an employee of the district attorney's office. The disclosure also included a brief excerpt of A.H.'s initial police interview and a memorandum from the Crime Victim Compensation Board Administrator. The excerpt of the interview indicated that a detective had interviewed A.H. regarding her relationship with M.H. The memorandum, in turn, revealed that A.H. had filed an application for victim compensation, but because A.H. personally knows all of the victim compensation staff members and its legal advisor (due to her position), the Board had determined that a conflict of interest existed and, thus, another judicial district would need to review A.H.'s application.

¶9 Following the People's disclosure, Arellano moved to disqualify the district attorney's office. In this motion, she argued that (1) A.H. will likely be a critical witness for the defense in this case and that the defense would want to interview her regarding her relationship with and victimization by M.H.; (2) self-defense may be a critical issue and the crux of Arellano's defense; (3) A.H.'s testimony

4

would be of sufficient consequence to prevent a fair trial because her employment status might influence her willingness to speak with defense investigators and her testimony at trial; (4) given that A.H. is a victim in this case, Arellano could not be guaranteed a fair negotiation process or trial; and (5) the Crime Victim Compensation Board had already determined that a conflict of interest existed for victim compensation purposes and this conflict affected the entire district attorney's office.

¶10 After receiving a response from the People acknowledging that disqualification is required when a member of the district attorney's staff will appear as a witness and give testimony of sufficient consequence to prevent a fair trial, but denying that any such circumstances exist here, the district court conducted a hearing on the matter. At this hearing, Arellano's counsel noted that since filing her written motion to disqualify, she had more closely reviewed the discovery provided by the People, and she stated that the information contained therein further supported her motion. Arellano began by observing that A.H. is the primary victim and point of contact for the district attorney's office for purposes of the Victim's Rights Act and therefore, that office was required to involve her in decision-making. Next, she noted that a detective had conducted an extensive interview with A.H. in which the detective had told A.H. that Arellano's "game" would be to try to sling mud at M.H. and to show that he was

5

a perpetrator of domestic violence and that his killing was therefore in self-defense. Having been primed with this information, A.H. proceeded to make a number of statements aimed at circumventing or undercutting any potential claim of self-defense by Arellano. For example, A.H. asserted, among other things, that (1) M.H. had never abused her in their lengthy marriage (despite a prior domestic violence charge against M.H. that named A.H. as the victim); (2) any claim to the contrary was untrue and mud-slinging by the defense; (3) A.H.'s daughter had sworn for years that Arellano was going to do something to hurt M.H.; (4) reports of a domestic violence situation on the day of the killing were untrue; and (5) Arellano planned the whole thing and there was no way that this killing was in self-defense (A.H. also volunteered the names of witnesses who she said could corroborate her beliefs in this regard). Finally, Arellano argued that, given the unique circumstances of this case, any ethical wall was unlikely to be effective.

¶11    Unsurprisingly, the People disagreed. In their view, the facts of this case did not rise to the level of the extreme circumstances warranting disqualification of a district attorney's office. In support of this argument, the People contended that much of the proposed testimony on which Arellano was relying (e.g., regarding the prior domestic violence charge against M.H. involving A.H.) would be uncontested and that some of this testimony would likely be irrelevant to a

6

self-defense claim or otherwise inadmissible. Moreover, the People disagreed with Arellano's contention that the ethical wall that they had erected would be ineffective, and they detailed the relatively few people who would have access to A.H. regarding this case. And the People discounted any potential conflict arising from a possible victim compensation award, noting that they did not believe that A.H. cares about the victim compensation claim (although they did not dispute that she had filed such a claim).

¶12 In a lengthy and detailed bench ruling, the court agreed with Arellano and granted her motion to disqualify the district attorney's office. The court began by accurately setting forth the applicable legal principles, none of which appear to have been disputed below. The court then made extensive findings regarding the facts before it. Among other things, the court found as follows:

¶13 First, A.H. is "a named victim and primary point of contact" for the district attorney's office, and she "sounds like [a] critical witness at trial." In particular, the court noted that A.H. had been "extensively interviewed" regarding her own interactions with M.H. and the interactions between Arellano and M.H. and that this information went to "a very central issue of possible motive or state of mind of a defendant and a possible legal defense and disproof by the prosecution of that legal defense."

¶14    Second, A.H. had sought victim compensation, and on the record before it, the court could not conclude that the district attorney's office had no potential financial interest in this case.

¶15    Third, the court believed that the ethical wall established in the district attorney's office was unlikely to be effective in terms of allowing appropriate conversations as required by the Victim's Rights Act and also in terms of appropriate trial preparation, including "follow up interviews and interactions in the investigation of the case as it relates to this district attorney's office interviewing, working with, and complying with . . . other statutes that require communication with [A.H.]."

¶16    Fourth, the court expressed concern and found "particularly problematic" the possible effect of A.H.'s status as an employee of the district attorney's office as well as the primary victim in this case on the "open and honest discussion of possible resolution of the case." In expressing this concern, the court acknowledged that this was not a linchpin of its ruling, nor was this factor determinative of the disqualification issue. Nonetheless, it was one factor that distinguished this case from others involving nothing more than possible district attorney testimony on a single issue.

¶17    Finally, the court noted its concern regarding the "weird conundrum" that could play out were a district attorney's employee to offer what could be "very

impactful and effective rebuttal to possible self-defense." On the one hand, a jury could infer "some sort of collusion" on the part of the district attorney's office. On the other hand, such testimony on "the very central defense maybe in the case" could "bolster the weight that's afforded to that evidence by a Jury because of [A.H.'s] standing as an employee of the DA's office."

¶18 Considering all of these facts as a whole, the court concluded that such facts presented "a risk of an unfair trial for the defendant and it's too great a risk for [the court] to feel comfortable moving forward." The court thus ruled that "there are special circumstances based on everything that's been placed on the record today to warrant the removal of the 4th Judicial District's DA's Office as the prosecutor in this case."

¶19 The People then filed this interlocutory appeal pursuant to section 16-12-102(2), C.R.S. (2020).

## II. Analysis

¶20 We first address the standard of review governing orders disqualifying a district attorney's office. Next, we discuss the circumstances in which a disqualification may be ordered pursuant to section 20-1-107(2). Last, we consider whether, in light of these legal principles, the district court abused its discretion when it disqualified the district attorney's office here.

## A. Standard of Review

¶21 District courts have broad discretion in determining whether to disqualify a district attorney's office from prosecuting a case. *People v. Epps*, 2017 CO 112, ¶ 14, 406 P.3d 860, 864. We review a district court's decision to disqualify a district attorney's office under an abuse of discretion standard. *People v. Loper*, 241 P.3d 543, 546 (Colo. 2010). Accordingly, we will not disturb a court's decision on a motion to disqualify unless the court's decision was manifestly arbitrary, unreasonable, or unfair. *People v. Kendrick*, 2017 CO 82, ¶ 36, 396 P.3d 1124, 1130. "[A] misapplication of the law necessarily constitutes an abuse of discretion." *Id.*

## B. Disqualification of the District Attorney's Office

¶22 Section 20-1-107(2) authorizes the disqualification of a district attorney in a particular case only (1) "at the request of the district attorney," (2) "upon a showing that the district attorney has a personal or financial interest" in the prosecution, or (3) if the court "finds special circumstances that would render it unlikely that the defendant would receive a fair trial." *Accord Kendrick*, ¶ 37, 396 P.3d at 1130.

¶23 In this case, the district court disqualified the district attorney's office under the "special circumstances" prong of section 20-1-107(2). Accordingly, we will limit our discussion to that prong of the statute.

10

¶24   The party moving to disqualify the district attorney based on "special circumstances" bears the burden of showing that absent disqualification, he or she will not receive a fair trial. *Loper*, 241 P.3d at 546. Whether it is likely that a defendant will receive a fair trial is the most important factor governing a court's decision to disqualify a district attorney under this prong of the statute. *Id.* To establish the requisite special circumstances, the movant must provide "actual facts and evidence in the record" supporting his or her contention, not merely hypothetical information. *Id.*

¶25   Our case law has not precisely defined what qualifies as special circumstances. *Id.* We have, however, stated that to justify disqualification on these grounds, the special circumstances must be "extreme," and a mere appearance of impropriety is insufficient. *Id.* at 546–47; *People in Interest of N.R.*, 139 P.3d 671, 675 (Colo. 2006).

¶26   When, as here, a member of the district attorney's staff appears as a witness in a case, the disqualification of the district attorney turns on whether the proposed testimony is of sufficient consequence to prevent a fair trial. *Epps*, ¶ 19, 406 P.3d at 865; *People v. Garcia*, 698 P.2d 801, 805 (Colo. 1985).

¶27   We have deemed the proposed testimony to be of such sufficient consequence when, for example, two attorneys from the same district attorney's office had been endorsed as witnesses, one by the prosecution and the other by the

11

defense, to testify to issues bearing directly on the defendant's guilt or innocence. *Pease v. Dist. Ct.*, 708 P.2d 800, 802–03 (Colo. 1985). Specifically, in *Pease*, the prosecution planned to call one member of the district attorney's office to testify to incriminating statements that the accused had made to him, and the defendant planned to call a different member of the district attorney's office to testify to exculpatory statements made by the accused and to "abuses allegedly committed by the prosecution." *Id.* at 802. Because the attorneys' testimony would relate to contested issues and be "both relevant and material to the issue of guilt," we deemed such testimony to be of sufficient consequence to prevent a fair trial and thus made absolute the district court's order disqualifying the district attorney's office. *Id.* at 803.

¶28 Likewise, in *Garcia*, 698 P.2d at 806, we upheld the district court's order disqualifying a district attorney's office when the prosecution planned to call a deputy district attorney to testify at trial to prove an element of the charged offense. There, the People charged Garcia with violating bond conditions after she did not appear for sentencing following her conviction on a different charge. *Id.* at 804. The prosecution endorsed the deputy district attorney as a witness to testify that Garcia had been present at the proceeding when the court ordered her to appear for the subsequent hearing, that she appeared to understand that order, and that she did not, in fact, appear at the hearing. *Id.* at 806. Because this

12

testimony was "relevant and necessary to prove the culpable mental state of 'knowingly,' which was an element of the offense charged," we concluded that disqualification of the district attorney's office was proper. *Id.*

¶29 In addition to the foregoing, in *People v. Chavez*, 139 P.3d 649, 654–55 (Colo. 2006), we evaluated the efficacy of a district attorney's screening policy in deciding whether the disqualification of an assistant district attorney required the disqualification of the entire district attorney's office. As an initial matter, we agreed that a properly drafted screening policy would be relevant to a court's determination as to whether "special circumstances" required the disqualification of the entire office. *Id.* at 654. We then observed that "the question of whether a district attorney's office has a screening policy that adequately obviates any special circumstances that might lead to an unfair trial" presents a fact question for the trial judge. *Id.* We said that if the screening policy were adequate, then disqualification would not be necessary, and we remanded for further findings on this point. *Id.* at 654–55.

¶30 Finally, we note that in deciding whether special circumstances render a fair trial unlikely, a court need not (and ordinarily should not) evaluate the facts before it in isolation but rather may properly consider all of those facts together to determine whether a defendant will receive a fair trial. *See* § 20-1-107(2); *see also People v. Eubanks*, 927 P.2d 310, 322 (Cal. 1996) (noting, in the context of a motion

to disqualify a district attorney's office based on an alleged conflict of interest, that "the trial court must consider the entire complex of facts surrounding the conflict to determine whether the conflict makes fair and impartial treatment of the defendant unlikely").

## C. Application

¶31 Here, the parties do not dispute the applicable law. Nor do we understand the People to be contending that the district court misperceived the applicable law. Rather, the People argue that the district court misapplied the pertinent law to the facts before it. For several reasons, however, we perceive no abuse of discretion by the district court.

¶32 Foremost, the record amply supports the district court's findings that A.H.'s testimony is of sufficient consequence to prevent a fair trial. As the district court observed, A.H. is a named victim and primary point of contact for the district attorney's office; she appears to be a critical witness at trial; and the information that she has already provided to the People, after being told of Arellano's likely "game," went to "a very central issue" of Arellano's possible motive or state of mind and to the People's effort to disprove what might be "the very central defense" in this case, namely, self-defense. Moreover, such testimony, coming from a district attorney's office employee, could be a "very impactful and effective rebuttal to possible self-defense," and a jury might well be inclined to "bolster the

14

weight" afforded such evidence because of A.H.'s standing as an employee of the district attorney's office. In our view, under the settled legal principles discussed above, such facts support a finding that because of A.H.'s relationship with the district attorney's office, her testimony is of sufficient consequence to prevent a fair trial here, thus warranting disqualification of the district attorney's office. *See, e.g., Epps,* ¶ 19, 406 P.3d at 865; *Pease,* 708 P.2d at 802–03; *Garcia,* 698 P.2d at 805–06.

¶33 In addition, the district court called into question the efficacy of the ethical wall established in the district attorney's office, particularly given A.H.'s rights — and the district attorney's office's obligations — under the Victim's Rights Act, as well as that office's need to involve A.H., as a central witness, in ongoing trial preparation. This, too, tends to support the district court's ruling. *See Chavez,* 139 P.3d at 654–55.

¶34 Finally, the court noted, again with ample record support, a number of additional factors that, when considered together with the foregoing facts, made it unlikely that Arellano would receive a fair trial were the district attorney's office to continue to prosecute her here. These included the facts that (1) A.H. had sought victim compensation, thereby establishing her and the district attorney's office's possible financial interest in the outcome of this case, and (2) A.H.'s status as an employee of the district attorney's office as well as the primary victim in this

15

case could adversely impact the "open and honest discussion of possible resolution of the case."

¶35 On these unique facts, all of which were supported by the record, and given that the district court correctly recited and applied the pertinent legal principles to such facts, we cannot say that the court's decision to disqualify the district attorney's office here was manifestly arbitrary, unreasonable, or unfair, so as to constitute an abuse of the broad discretion afforded district courts in cases like this one.

¶36 In reaching this conclusion, we are not persuaded otherwise by the fact that in describing A.H.'s proffered testimony, the district court, at times, used circumspect words like "sounds like" or "suggesting." A district court cannot know at an early stage of a case, any more than the parties can, precisely what a witness's future trial testimony will be, and section 20-1-107(2) does not require such prescience from the court. Nor does the use of such language signal mere speculation by the district court, especially here, where the evidence indicated with specificity the statements that A.H. has already given to the district attorney's office and the police and that go to the "very central issue" of Arellano's state of mind and the People's effort to disprove her claim of self-defense.

## III. Conclusion

¶37    For the foregoing reasons, we affirm the district court's order disqualifying the Fourth Judicial District Attorney's office and ordering the appointment of a special prosecutor, and we remand this case for further proceedings consistent with this opinion.

**JUSTICE SAMOUR** dissents and **CHIEF JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent.

JUSTICE SAMOUR, dissenting.

¶38 Our court goes one for two in today's doubleheader. It gets *People v. Kent* right, but it swings and misses here. A .500 performance is great for any hitter in baseball; not so much for an appellate court.

¶39 I am concerned that the majority opinion in this case will have unintended adverse consequences. If the majority is right, whenever a member of a district attorney's office (including an investigator) is endorsed as a witness, mere speculation will suffice to disqualify the entire prosecuting office from the case. Because the majority errs in upholding the district court's faulty disqualification order, and because the majority at best muddies the waters and at worst fails to correctly interpret our jurisprudence, I write separately.

## I. Introduction

¶40 Despite reviewing the majority opinion with a fine-tooth comb multiple times, I haven't been able to find the requisite district court *findings* of "extreme" and "narrow" "special circumstances" justifying the "drastic" remedy of disqualification. *See People v. Loper*, 241 P.3d 543, 546–47 (Colo. 2010). The reader needn't bother looking for them. They're not in there. And, after reviewing the transcript of the district court's convoluted ruling, I now know why. The district court made no such findings. But rather than admit this and reverse, the majority forges ahead and affirms.

1

¶41 The majority is content to rely on the district court's hemming and hawing. It indulgently bestows the label of "findings" on the district court's speculative comments, which were littered with noncommittal terms such as "sounds like," "potentially," "maybe," "may," "might be," "could be," "suggesting," and "possibly." However, these fig leaves, even when sewn together, cannot cover up the findings void in the district court's ruling. And, unlike my colleagues in the majority, I cannot in good conscience sweep this hamartia under the rug.

¶42 Even overlooking the findings-deficient ruling, the record reveals that Arellano didn't come close to meeting her heavy burden of showing extreme and narrow circumstances warranting the drastic remedy of disqualification. The motion to disqualify, which was based almost entirely on conjecture, failed to demonstrate that A.H.'s proposed testimony is of sufficient consequence to render it unlikely that Arellano would receive a fair trial. Further, to the extent Arellano's motion relied on A.H.'s request for restitution to allege that the district attorney has a financial interest that qualifies as a special circumstance justifying disqualification, it was legally and factually untenable.

¶43 Because the district court misapplied the law, it abused its discretion. Accordingly, I respectfully dissent.

## II. Analysis

### A. The District Court Made No Findings to Support Its Conclusion That A.H.'s Proposed Testimony Is of Sufficient Consequence

¶44 Our legislature has wisely recognized the need "to protect the independence of persons duly elected to the office of district attorney." § 20-1-107(1), C.R.S. (2020). In furtherance of that goal, section 20-1-107(2) provides that a district attorney "may only be disqualified" from a case in limited situations: (1) "at the request of the district attorney"; (2) "upon a showing that the district attorney has a personal or financial interest" in the case; or (3) if the court finds "special circumstances that would render it unlikely that the defendant would receive a fair trial." These are the three exclusive bases to disqualify a district attorney. *Loper*, 241 P.3d at 546. Though I devote some discussion to the "personal or financial interest" prong at the end of this dissent, I focus on the "special circumstances" prong because it is the only one in play for the majority.

¶45 The critical inquiry with regard to the "special circumstances" prong is whether it is likely that the defendant would receive a fair trial. *Id.* The party seeking to disqualify the district attorney bears "the burden of showing that it is unlikely that [she] will receive a fair trial." *Id.* To meet this burden, the moving party must point to "*actual facts and evidence* in the record supporting the

3

contention." *Id.* (emphasis added). "[M]ere *hypothetical* information" is not sufficient. *Id*. (emphasis added).

¶46 Relevant to this case, we have instructed that when the special circumstance alleged is that a district attorney or a member of her staff will testify at trial, disqualification is not warranted unless the anticipated testimony of that witness is "of sufficient consequence" to render it unlikely that the defendant would receive a fair trial. *People v. Epps*, 2017 CO 112, ¶ 19, 406 P.3d 860, 865 (quoting *People v. Garcia*, 698 P.2d 801, 805 (Colo. 1985)). Nothing in our case law suggests that in this type of situation the motion may dispense with actual facts and evidence and may, instead, rely on hypothetical information. The requirement of actual facts and evidence, just as the concomitant caveat that hypothetical information will not suffice, always applies. And for good reason: Disqualification of a district attorney is a "drastic" remedy that should be granted only in "narrow circumstances." *Loper*, 241 P.3d at 547. As the majority acknowledges, special circumstances must be "extreme" to justify disqualification. Maj. op. ¶ 25 (quoting *Loper*, 241 P.3d at 546).

¶47 Given the high bar of "extreme" and "narrow" special circumstances, and given further the "drastic" nature of the remedy of disqualification, it is not surprising that, since our General Assembly amended section 20-1-107(2) in 2002, this is the first time we conclude that a witness's proposed testimony is of

4

sufficient consequence to warrant disqualification. *See, e.g.*, *Epps*, ¶ 23, 406 P.3d at 866; *People v. C.V.*, 64 P.3d 272, 276 (Colo. 2003). Even prior to the 2002 amendment, we had identified almost no scenarios in which the circumstances related to proposed testimony were sufficiently extreme so as to justify disqualifying a district attorney. The majority discusses the two lone exceptions in our case law: *Pease v. District. Court*, 708 P.2d 800, 802–03 (Colo. 1985) and *Garcia*, 698 P.2d at 805. Maj. op. ¶¶ 27–28.

¶48 However, *Pease* and *Garcia* are both distinguishable. In *Pease*, two employees of the prosecuting office were endorsed as witnesses (one by each party), and their testimony was undoubtedly necessary and admissible—it was directly relevant to contested issues, including the issue of guilt. 708 P.2d at 802–03. One witness was expected to testify about incriminating statements made to him by the defendant, while the other was planning to testify about exculpatory statements made to him by the defendant and abuses committed by the prosecution. *Id.* at 802. Similarly, in *Garcia*, a deputy district attorney planned to offer the only testimony regarding the culpable mental state element of the offense charged. 698 P.2d at 806. Again, that testimony was directly relevant to contested issues, including the issue of guilt, and was thus clearly necessary and admissible. *Id.*

¶49 The district court's findings in this case are a far cry from those involved in *Pease* and *Garcia*. This case more closely resembles *Riboni v. District Court*, where we declined to disqualify a district attorney because "there was no indication" that her testimony "would be needed or even admissible." 586 P.2d 9, 11 (Colo. 1978); *see also C.V.*, 64 P.3d at 276 (noting that there was no showing that the district attorney's testimony would be needed or that it would prevent a fair trial).

¶50 Sidestepping an inconvenient truth, the majority disregards the requirement that proffered testimony must be necessary and admissible before it may be deemed sufficiently consequential to justify disqualification. *See C.V.*, 64 P.3d at 276. But this requirement is indispensable. If the proffered testimony is not necessary or admissible, how can it possibly be of sufficient consequence to render it unlikely that the defendant would receive a fair trial?

¶51 In attempting to rescue the district court's ruling, the majority generously describes the court's reflections as "extensive findings." Maj. op. ¶¶ 5, 12.[1] However, the majority strains to identify *any* actual pertinent findings, never mind extensive ones. There are none.

---

[1] The majority notes that the district court made its findings in "a lengthy and detailed bench ruling." Maj. op. ¶ 4. While the court's discussion was lengthy and detailed, the ruling was not.

¶52    The district court cabined each relevant statement it uttered with disclaimers and cautionary qualifiers, lacing its meandering opinion with equivocal terms such as "sounds like," "potentially," "maybe," "may," "might be," "suggesting," and "possibly."  In fact, the court's analysis of A.H.'s proposed testimony is as replete with speculative modifiers as it is bereft of actual *findings* of necessity and admissibility.

¶53    To illustrate, the court spoke as follows: "[I]t *sounds like*" A.H. "*may potentially*" be called as a witness for the prosecution or the defense; A.H. was asked statements by law enforcement "that *might* . . . relate to *maybe* what she knew or had personal knowledge of"; and "*it sounds like* there were also statements" attributed to A.H. "*suggesting* that she had other information . . . . regarding *maybe* prior instances" of domestic violence.  (Emphases added.)   The court also expressed concern about "the *possible* effect" that A.H.'s employment "*may* be having" on potential plea negotiations, even though the court simultaneously disclaimed any information in the record regarding what that effect could be.  (Emphases added.)  On the critical issue of how A.H.'s testimony would affect Arellano's self-defense claim at trial, the court merely noted that "the evidence *might* appear to play out that [A.H.] *might* have made statements" regarding the unlikelihood that Arellano acted in self-defense.  (Emphases added.)  But in the

7

next breath, the court admitted that, based on the record, it lacked information regarding "the . . . underlying foundation for [Arellano's] personal knowledge."

¶54 Despite the majority's best effort, it is impossible to metamorphosize the district court's musings about A.H.'s proffered testimony into "findings" (extensive or otherwise). What the record reflects is that the district court tiptoed around the issue and never decided whether A.H.'s proffered testimony was actually necessary or admissible so as to be of sufficient consequence to render it unlikely that Arellano would receive a fair trial.

¶55 Significantly, the court acknowledged that some of the proposed testimony from A.H. on which Arellano's motion relied may well be "speculation," "objectionable," and "inadmissible at the time of trial." Along the same lines, the court articulated other doubts about the admissibility of A.H.'s proposed testimony. For instance, in regard to A.H.'s conversation with Detective Bickel, the court said, "Now, what of that may be admissible or not, I don't really know yet." Likewise, on A.H.'s anticipated testimony relating to the self-defense claim, the court surmised that her statements "*may* under certain circumstances be admissible." (Emphasis added.) The court resolved none of these questions.

¶56 Yet, these are the types of "extensive findings" the majority speaks of in its opinion. If these count as "findings," then whenever an investigator or other member of a district attorney's office is endorsed as a witness, the defense may

disqualify the entire prosecuting office from the case based on nothing more than speculation.

¶57   I understand that it is difficult to predict how every single aspect of a trial will play out and that, consequently, there may be occasions in which it is challenging to discern the necessity and admissibility of certain proposed testimony. For that reason, our case law has never demanded "prescience." Maj. op. ¶ 36. But district courts are routinely called upon to make pretrial evidentiary determinations, and they should not be allowed to evade those responsibilities by claiming that they "cannot know . . . , any more than the parties can, precisely what a witness's future trial testimony will be." *Id.* That's an unpersuasive cop-out. And, here, the district court made no definitive findings of necessity or admissibility at all—none. In fact, it didn't even push either party to state with any degree of conviction whether it truly intends to introduce any of the proffered testimony at trial, and, if so, why such testimony is necessary and admissible.[2]

¶58   Arellano, in particular, as the party requesting disqualification, was required to identify the necessary and admissible proposed testimony that she

---

[2] The People requested more time to "get additional information on . . . what may or may not be relevant, what's speculative, [and] what is hearsay." But the court denied their request.

believed would prevent her from receiving a fair trial. Instead of holding Arellano to her burden, though, the court permitted her to speculate that A.H. would "likely" be a critical witness, that self-defense "may be" a critical issue and the crux of the defense, that the defense "would want" to interview A.H., that A.H.'s employment status "might" influence A.H.'s willingness to speak with defense investigators and A.H.'s testimony at trial, and that there was "no[] . . . guarantee[]" of a fair negotiation process or trial. Maj. op. ¶ 9. These types of speculative allegations can be advanced in just about every criminal case. Allowing this kind of wholesale conjecture by Arellano was the court's first mistake, and it set in motion a cascade of other mistakes that culminated in its flawed ruling.

¶59 In my view, the majority errs in upholding the "sufficient consequence" determination, especially given that the district court admitted that A.H.'s proffered testimony may be speculative, objectionable, and inadmissible. The majority should recognize that such testimony cannot suffice as the type of extreme and narrow special circumstance that warrants the drastic remedy of prosecutorial disqualification.[3]

---

[3] The majority attempts to buoy its view of A.H.'s proposed testimony with her employment at the district attorney's office. Maj. op. ¶ 32 ("[B]ecause of A.H.'s relationship with the district attorney's office, her testimony is of sufficient

## B. Arellano Did Not Come Close to Meeting Her Burden of Establishing That A.H.'s Proposed Testimony Was of Sufficient Consequence

¶60 Even overlooking the dearth of findings in the district court's ruling, the record reflects that Arellano fell woefully short of satisfying her burden of proving that A.H.'s proposed testimony is of sufficient consequence. Because A.H.'s proposed testimony is unnecessary and inadmissible, I see no path for Arellano to establish that it is of sufficient consequence to justify the drastic remedy of disqualification. I examine each part of A.H.'s proffered testimony separately.

¶61 First up is A.H.'s proposed testimony relating to a 2008 misdemeanor domestic violence incident in which she was the named victim and M.H. was the defendant.[4] This proposed testimony is irrelevant unless Arellano can establish that she had personal knowledge of the 2008 incident when she allegedly killed M.H. in self-defense. Nothing in the record suggests that Arellano can do so, and

---

consequence to prevent a fair trial . . . ."). I don't follow that reasoning. How can A.H.'s place of employment make her proposed testimony any more or less consequential vis-à-vis the likelihood that Arellano would receive a fair trial? The question of sufficient consequence refers to the level of importance of the proposed testimony at trial.

[4] To be clear, while I refer to A.H.'s "proposed," "proffered," and "anticipated" testimony throughout this dissent, the reality is that we don't even know exactly what A.H. would be called to testify about at trial because of the way the district court handled the hearing on the motion to disqualify.

she certainly didn't put forth any evidence, or even an offer of proof, in that regard. Moreover, A.H. denied that M.H. had ever abused her, and the People offered to stipulate to the existence and disposition of the 2008 case if the district court found the incident relevant and admissible.

¶62 Second, statements by A.H. to law enforcement "aimed at circumventing or undercutting any potential claim of self-defense by Arellano," *id.* at ¶ 10, are wholly irrelevant and inadmissible.[5] How is it relevant that A.H. asserted that "any claim" by the defense that M.H. abused her in the past was "mud-slinging"? *Id.* Or that A.H. said that her "daughter had sworn for years that Arellano was going to do something to hurt M.H."? *Id.* Or that, in A.H.'s personal opinion, "reports of a domestic violence situation on the day of the killing were untrue"? *Id.* Or that A.H. surmised that "Arellano planned the whole thing and there was no way this killing was in self-defense"? *Id.* None of this speculative, foundationless, irrelevant information stands a chance of coming into evidence at trial. The statement by A.H. as to what her daughter said is also inadmissible hearsay.

---

[5] The fact that, in spite of the 2008 misdemeanor case, A.H. claimed M.H. had never abused her doesn't render her testimony about her prior relationship with M.H. relevant and admissible.

12

¶63 Finally, Arellano pointed to A.H.'s statements to law enforcement in which A.H. described Arellano's alleged ownership of a firearm and history with firearms. This, too, may well be inadmissible hearsay. Additionally, in this self-defense case, whether Arellano owned a firearm or had a history with firearms doesn't readily seem relevant under C.R.E. 401, much less admissible under C.R.E. 403. Besides, as the People note, there are other witnesses who can testify about Arellano's ownership of and history with firearms, rendering this proffered testimony unnecessary.

¶64 Proposed testimony is not of sufficient consequence unless it is necessary and admissible. Because A.H.'s anticipated testimony is neither, Arellano cannot meet her burden of proof.

### C. The Majority Errs in Considering the District Attorney's Alleged Financial Interest as a Special Circumstance; Regardless, the Record Does Not Support the District Court's Conclusion Regarding Financial Interest

¶65 The majority's analysis is problematic for two additional, related reasons. First, though the majority corrals its discussion to the special circumstances prong of section 20-1-107(2), it finds that the district attorney has a "financial interest" in this case based on A.H.'s restitution request to the Victim Compensation Board ("VCB"). By lumping the district attorney's alleged financial interest in the case under the special circumstances umbrella, the majority effectively renders the financial interest prong in section 20-1-107(2) superfluous and meaningless. This

13

is error. *See, e.g.*, *Howard v. People*, 2020 CO 15, ¶ 13, 458 P.3d 893, 897 ("We 'disfavor a reading of a statute that would render other statutory provisions superfluous or without practical effect.'" (quoting *Roberts v. Bruce*, 2018 CO 58, ¶ 9, 420 P.3d 284, 286)).

¶66 Second, this court has interpreted the term "financial interest" in section 20-1-107(2) narrowly so as to require disqualification only where the district attorney or her office as a whole will receive some type of benefit or face some type of detriment that renders a fair trial for the defendant unlikely. *See Epps*, ¶ 18, 406 P.3d at 865 (noting that disqualification was not required where the defendant did not allege, much less show, that "the deputy district attorney or the district attorney's office as a whole would receive either benefit or detriment" at the conclusion of the trial); *People v. Perez*, 238 P.3d 665, 667 (Colo. 2010) ("[A] district attorney or her office's financial interest is a statutorily authorized basis for disqualification only if the financial interest would render it unlikely that the defendant would receive a fair trial."). Thus, the fact that the district attorney or one of her employees may have a financial interest in a case is not enough to require the drastic remedy of disqualification under section 20-1-107(2).

¶67 We have identified two scenarios where a financial interest would render a fair trial for the defendant unlikely: (1) where the financial interest is dependent on the outcome of the case; and (2) where the financial interest would have "a

14

substantial impact on the district attorney's discretionary function, such that the district attorney's conduct interferes with, is contrary to, or is inconsistent with her duty of seeking justice." *Perez*, 238 P.3d at 667. Neither is present here.

¶68 The district court did not find that the district attorney or his office has a financial interest in the case, much less a financial interest that fits into a scenario that suffices for disqualification. To the contrary, the district court explicitly recognized that neither the district attorney nor his prosecutors have a direct financial interest in the case. And the record supports that conclusion.[6]

¶69 That A.H., an employee of the district attorney's office, submitted a restitution request to the VCB doesn't alter the analysis. To the extent the district court believed that A.H.'s request for restitution was outcome-dependent, it was clearly mistaken. No Colorado authority supports that position.

## III. Conclusion

¶70 I have a hard time reconciling the decision in this case with *Kent*—the companion case we are announcing simultaneously—and well-settled Colorado case law governing motions to disqualify a district attorney. And I fear that the majority opinion here will have unintended repercussions. Respectfully, I dissent.

---

[6] Perhaps this explains why the majority follows the district court's lead in jamming A.H.'s restitution request into the "special circumstances" rubric of section 20-1-107(2).

15

I am authorized to state that CHIEF JUSTICE COATS and JUSTICE BOATRIGHT join in this dissent.